IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Linda Ell, | ) |
| | ) |
| Plaintiff, | ) **ORDER RE CROSS MOTIONS** |
| | ) **FOR SUMMARY JUDGMENT** |
| vs. | ) |
| | ) |
| Kilolo Kijakazi, Acting Commissioner | ) |
| of Social Security Administration, | ) Case No. 1:21-cv-226 |
| | ) |
| Defendant. | ) |

Plaintiff Linda Ell seeks judicial review of the Social Security Commissioner's denial of her application for Disability Insurance Benefits ("DIB"). This court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). Before the court are competing motions for summary judgment filed by Ell and Kilolo Kijakazi, Acting Commissioner of the Social Security Administration ("Commissioner"). (Doc. Nos. 10 and 12). For the reasons that follow, the court denies Ell's motion and grants the Commissioner's motion.

**I.      BACKGROUND**

    **A.      Personal History**

Ell was forty-two years old on the alleged onset date of disability. Doc. No. 8-2 at p. 45; Doc. No. 8-3 at p 16. She lives with her husband and son. Doc No. 8-2 at p. 46. She has completed two and a half years of college. Id. at p. 45. Her employment history includes work as a convenience store manager, a night auditor at a hotel, and in retail as a department head and an office manager. Doc. No. 8-7 at pp. 38-42. She has not engaged in substantive gainful activity since the alleged onset date. Id.; Doc. No. 8-3 at p. 7.

Ell suffers from thoracic outlet syndrome, carpel tunnel syndrome, cubital tunnel syndrome,

1

degenerative disc disease of the cervical spine, asthma, obesity, depression and general anxiety disorder. Doc. No 8-2 at pp. 48-49; Doc. No. 8-3 at p. 7; Doc. No. 8-9 at pp 12-14, 26-27. Her medical records also mention a history of arthritis, allergies, and headaches. Doc. No. 8-10 at p. 27. She underwent carpal tunnel and cubital tunnel surgeries in May 2014 and first rib resection surgery in February 2018. Doc. No. 8-2 at pp. 48-49; Doc. No. 8-9 at pp. 9-10, 12-25.

Ell continues to experience paresthesia in her hands and pain in her shoulders and upper extremities, which she reports has limited her strength and made it difficult for her to grasp things. Doc. No. 8-2 at pp. 47-47; Doc. No. 8-9 at p. 38; Doc. No. 8-10 at p. 18. She reports that the pain starts in her fingertips, runs up her forearms, elbows, upper arms, and into her shoulders and that she often experiences pain in her lower back, knees, and legs when engaging in physical activity. Doc. No. 8-7 at pp. 19-22. On a scale of one to ten, with ten being worst, she rates her pain as a constant three to four. Id. For relief, she has on occasion used a TENS unit. Id. at p. 22. She has also taken over-the-counter analgesics as needed. Id. at pp. 32, 36; Doc. No. 8-10 at p. 11. She has in the past been prescribed Lyrica and Tramadol, but reports that she no longer takes these medications as they are ineffective and make her head "fuzzy." Doc. No. 8-5 at p. 28; Doc. No. 8-7 at p. 19. She wears wrist splints, which she reports provides only minimal relief. Doc. No. 8-7 at pp. 20, 31, 72. She has been prescribed Albuterol for her asthma. Doc. No. 8-9 at p. 28; Doc. No. 8-10 at p. 11. To manage her anxiety and depression, she is foregoing medications she had been prescribed in the past (before 2009) and instead sees a counselor approximately every two weeks. Doc. No. 8-2 at pp. 54-55.

Ell reports that she is able to drive and perform light housekeeping chores without assistance. Id.; Doc. No. 8-7 at p. 21. However, she also reports that her pain is exacerbated when

performing simple, everyday tasks, can only use her left hand/arm for 10 minutes and right hand/arm for 5 minutes before she has to take a break, cannot engage in repetitive activities, cannot climb, and is ostensibly unable to lift, push, or pull. Id. at pp. 19, 23, 25, 79. Finally, she reports that she can no longer cross-stitch, crochet, or play ball, piano, or the flute and that she has curtailed her social activities on account of her condition. Id. at pp. 26, 29.

### B.     Procedural History

Ell protectively filed an application for DIB on June 26, 2016, alleging a disability onset date of October 21, 2014. Doc. No. 8-3 at pp. 5. Her application was denied initially on September 14, 2016, and upon reconsideration on December 12, 2016. Id. Upon her request, an Administrative Law Judge ("ALJ") convened a hearing on March 7, 2019. Id. On June 5, 2019, the ALJ issued a written decision, finding that she had not been under disability as defined in the Social Security Act during the relevant period. Id. at pp. 5-18.

Ell protectively filed her current application for DIB on April 6, 2019, alleging a disability onset date of October 20, 2014. Doc. No. 8-2 at p. 11; Doc. No. 8-6 at pp. 2-3. Her application was denied initially on July 1, 2019, and upon reconsideration on November 18, 2019. Doc. No. 8-2 at p. 11; Doc. No. 8-4 at pp. 2-6, 8-13.

On December 2, 2019, Ell requested a hearing before an Administrative Law Judge ("ALJ"). Doc. No. 8-4 at pp. 15-16. The Social Security Administration ("SSA") acknowledged the request in a letter dated December 26, 2019. Id. at p 17.

On October 8, 2020, the ALJ convened an administrative hearing. Doc. No. 8-2 at pp. 39-60. Ell appeared via telephone and, with the assistance of counsel, amended her alleged disability onset date to October 2, 2018. Id. at pp. 44-45. A Vocational Expert ("VE") also appeared by telephone.

<u>Id.</u> at pp. 41-42, 55-59.

The ALJ posed two hypothetical questions to the VE. First, the ALJ asked whether an individual of Ell's age and with Ell's education and work experience could perform Ell's past work if the individual: (1) had the capacity to lift and/or carry up to 10 pounds frequently and 20 pounds occasionally; (2) could sit throughout an eight-hour day with normal breaks; (3) could stand and/or walk for about six hours in an eight-hour day with normal breaks; (4) could never climb ladders, ropes, or scaffolds but could occasionally climb stairs or ramps; (5) could push or pull up to five pounds with each upper extremity, reach over head occasionally, balance, stoop, kneel, crouch or crawl; (6) could frequently handle, finger, and feel with the upper extremities; (7) could tolerate only occasional exposure to extreme cold, heat, vibrations, fumes, odors, dust, gasses, and hazards such as moving machinery and unprotected heights; and (8) could carry out simple instructions and maintain attention and concentration for routine work for two hour segments. Doc. No. 8-2, at pp. 56-57. The VE responded that the individual could not perform Ell's past work but could perform other work.

> Q      Could such an individual perform other work?
>
> A      One clarification, what was the reaching level that we're looking at?
>
> Q      I only limited reaching overhead to occasionally.
>
> A      Okay, thank you. I would offer a few. The Dictionary of Occupational Titles doesn't differentiate between reaching overhead and reaching in other planes, and so the jobs that I will identify for this hypothetical would all have reaching listed as frequent. And while there is frequent reaching in other planes, my observation of these types of jobs and working with employers and employees in an employment setting really don't s how that there's more than
> occasional, if that, overhead reaching.
>         So , the first I would offer would be a bench assembler position, 706.684-022, an SPV of 2, and a light duty position, 109, 000 jobs nationwide. A sub assembler position, 729.68 4-054, an SVP of 2, and a light duty position, 17, 000 jobs

>nationwide. And then a copy machine operator, 207.685- 014, and SVP of 2, and a light duty position, 15,000 jobs nationwide.

Id.

Second, the ALJ asked the VE whether the other work that he had just listed could be performed by the individual described in the first hypothetical but whose handling, fingering and feeling was limited to "occasionally." Id. at p. 58. The VE responded that individual would be unable to perform the work just described but could perform other work.

>Q      Could that individual perform the jobs you identified in hypothetical number l?
>
>A      No, I think all of those would require more than that.
>
>Q      And are there other jobs you could identify for hypothetical number 2?
>
>A      I would offer a few. Again, the numbers are not real large, but first would be a counter clerk, 249.366-010 , an SVP of 2 , and a light duty position, 3,000 jobs nationwide. And then I think I would go down to some sedentary types of jobs, if that's okay.
>
>Q      Go ahead.
>
>A      First would be a surveillance system monitor, 379.367-010, an SVP of 2, and a sedentary position, 2,900 jobs nationwide. And then a callout operator, 237.367-014, and SVP of 2, and a sedentary position, 2 ,800 jobs nationwide.

Id.

Ell's counsel did not challenge the job numbers offered by the VE at the administrative hearing, did not question the VE regarding the methodology underlying the job numbers, and did not challenge the job numbers in any post-hearing submissions or submissions to the Appeals Council.

On November 3, 2020, the ALJ issued a written decision, finding that Ell was not disabled as defined in the Social Security Act during the relevant period. Doc. No. 8-2 at pp. 11-23. At steps

one and two of her analysis, the ALJ determined that Ell met the insured status requirements of the Social Security Act, had not engaged in substantial gainful activity since the alleged disability onset date, and suffered from a number of severe impairments, i.e., thoracic outlet syndrome, cubital tunnel syndrome, carpel tunnel syndrome, denegerative disc disease of the cervical spine, asthma, obesity, depression, and general anxiety disorder. Id. at pp. 13-14.  At step three, the ALJ determined that Ell's impairments alone or in combination were not presumptively disabling. Id. at pp. 14-16.  The ALJ further determined that Ell retained the Residual Functional Capacity ("RFC") to perform light work with certain limitations. Id. at pp. 16-21.  At step four, the ALJ determined that Ell could not perform any of her past relevant work. Id. at pp. 21-22.  At step five, the ALJ determined that there were jobs existing in significant numbers in the national economy that Ell could perform, opining:

> Through the date last insured, if the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, through the date last insured, the Administrative Law Judge asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as counter clerk, Dictionary of Occupational Titles (DOT) #249.366-010 (specific vocational preparation (SVP) 2, light), of which there are approximately 3,000 in the national economy; surveillance system monitor, DOT #379.367-010 (SVP 2, sedentary), of which there are approximately 2,900 in the national economy; and call-out operator, DOT #237.367-014 (SVP 2, sedentary), of which there are approximately 2,800 in the national economy.
>
> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles, though the vocational expert clarified that he also relied on his experience in the vocational rehabilitation field with regard to some of his testimony (e.g., reaching overhead versus reaching generally) (See Ex. B13E).

> Based on the testimony of the vocational expert, the undersigned concludes that, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

Id. at pp. 22-23.

The Appeals Council denied Ell's request to reconsider the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  Doc. No. 8-2 at pp. 2-6.

Ell initiated the above-captioned action by Complaint on December 29, 2021.  Doc. No. 1.  On June 27, 2022, she  filed a Motion for Summary Judgment, asserting that reversal or, in the alternative, remand is appropriate because the jobs identified by the ALJ at step five of the sequential analysis do not exist in significant numbers and because the ALJ did not adequately consider her Functional Capacity Assessment. Doc. Nos. 10 and 11.

On July 25, 2022, the Commissioner filed a combined Motion for Summary Judgment and response to Ell's motion.  Doc. Nos. 12 through 14.

## II. APPLICABLE LAW

### A. Law governing eligibility for adult benefits

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; see also 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do their

previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account their age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a).

The burden of proving the existence of disability generally lies with the claimant. 42 U.S.C. § 423(a)(1)(D); 20 C.F.R. §§ 404.1512(a), 416.912(a). "To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act"). 42 U.S.C. § 423(a)(1)(D). To meet this burden, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment. 42 U.S.C. § 423(d)(1)(A)." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the claimant would be hired if they applied for work. 42 U.S.C. § 423(d)(2)(A). Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id.

When considering whether a claimant is disabled within the meaning of the Act, the ALJ follows a five-step process and considers:

(1) whether the claimant is presently engaged in a substantial gainful activity,

(2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3) whether the claimant has an impairment that meets or equals a presumptively

>    disabling impairment listed in the regulations,
>
> (4)  whether the claimant has the residual functional capacity to perform his or her past relevant work, and
>
> (5)  if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

20 C.F.R. § 404.1520; Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010).

If the ALJ reaches the fourth step, the ALJ must determine a claimant's RFC, which is what the claimant can do despite their limitations. 20 C.F.R. § 404.1545; see McCoy v. Astrue, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012) (quotation omitted).

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." Norper v. Saul, 964 F.3d 738, 744 (8th Cir. 2020); see Perks, 687 F.3d at 1092; see also 20 C.F.R. §§ 404.1546(c), 416.946(c). "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017). Thus, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion." Schmitt v. Kijakazi, 27 F. 4th 1353, 1360 (quotation omitted). Nor is an ALJ "limited to considering medical evidence exclusively." Id. (quotation omitted). Accordingly, "[e]ven though

9

the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." Perks, 687 F.3d at 1092 (quotation omitted); accord Schmitt, 27 F. 4th at 1360; see 20 C.F.R. §§ 404.1546(c), 416.946(c).

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove he is disabled. Brantley v. Colvin, No. 4:10CV2184 HEA, 2013 WL 4007441, at *3 (E.D. Mo. Aug. 2, 2013) (citation omitted). At step five, the burden shifts to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F. Supp. 2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

B. **Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. Nash v. Comm'r, Soc. Sec. Administration, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g)); Chismarich v. Berryhill, 888 F.3d 978, 979 (8th Cir. 2018). The court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." Id. "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.

10

(internal quotation marks omitted)); see, e.g., Chismarich, 888 F.3d 978, 979 (8th Cir. 2018) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (internal quotation marks omitted)); Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992) (stating that substantial evidence is less than a preponderance, but more than a scintilla of evidence).

This standard requires the court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011); see Grindley v. Kijakazi, 9 F.4th 622, 627 (8th Cir. 2021).  The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." Boettcher, 652 F.3d at 863.  "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." Chaney v. Colvin, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted).  Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Perks, 687 F.3d at 1091 (internal quotation marks omitted); see also Kraus v. Saul, 988 F.3d 1019, 1024 (8th Cir. 2021) (stating that the ALJ's decision is to be disturbed only if the decision lies "outside the available zone of choice").

### III. DISCUSSION

#### A. Jobs Identified by ALJ

As noted above, the VE identified three representative occupations that a hypothetical individual of Ell's age and with Ell's experience, education, and limitations could perform: (1) counter clerk, of which there are approximately 3,000 in the national economy; (2) surveillance system monitor, DOT, of which there are approximately 2,900 in the national economy; and (3)

call-out operator, of which there are approximately 2,800 in the national economy. Doc. No. 8-2 at pp. 22-23. Relying on the VE's testimony, the ALJ determined at step five of the analysis that there were a significant number of jobs in the national economy that Ell could perform. The Commissioner in turn adopted the ALJ's determination.

Ell asserts that the Commissioner did not meet her burden at step five because the jobs identified by the VE do not exist in significant numbers. She emphasizes that, to her knowledge, 200 jobs in a claimant's region is the smallest number found to be significant by the Eighth Circuit. See Johnson v. Chater, 108 F.3d 178-180-81 (8th Cir. 1997); see also Mueller v. Berryhill, No. 3:17-CV-78, 2018 WL 2296596, at *6 (D.N.D. Feb. 26, 2018). Operating under the assumption that the jobs identified by the VE are equally distributed throughout the country, she then points out that, by her calculation, the average number jobs in each occupation identified by the VE are 60, 58, and 56 per state.

In response, the Commissioner asserts that Ell did not make the number of jobs an issue at the administrative hearing and is therefore foreclosed from raising this issue now. Alternatively, the Commissioner asserts that the VE identified a representative sample of jobs Ell could perform, not an exhaustive list, that Ell's counsel did not attempt to develop at the administrative hearing an exhaustive list of jobs that Ell could perform, and that the total of 8,700 representative occupations nationally, which averages out to approximately 175 per state, constitutes a significant number in the present context. For support, she relies on cases where courts have adopted a relatively low threshold number when considering whether the number of available jobs is significant.

As noted above, the Commissioner has the burden to show "there are jobs that exist in significant numbers in the national economy that the claimant can perform." Id. The phrase "work

which exists in the national economy" is a term of art that means something more specific than the ordinary understanding of that term. See Benthin v. Saul, No. 1:20-cv-01014-CBK, 2021 WL 2982719, at *7 (D.S.D. July 15, 2021). While the " word 'national' implies that national numbers are the ones with which the SSA should be concerned," the statutory definition of the entire phrase "explains that the requirement goes further than raw national numbers" and encompasses "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A)); see also 20 C.F.R. §§ 404.1566(a) and (b). Work which exists in the national economy is not synonymous with work in the region where the claimant lives. Id.

Courts in the Eighth Circuit have differed on whether a finding that "work which exists in the national economy" satisfies the ALJ's burden to show that work exists in significant numbers in several other regions of the country. See Alice T. v. Kijakazi, No. 8:21CV14, 2021 WL 5302141, at *17 (D. Neb. Nov. 15, 2021) (collecting cases). For example, courts in the District of South Dakota have held that the Commissioner must demonstrate that jobs exist in the claimant's region or in several regions of the country, reasoning that "[a] citation to national numbers alone does not suffice to meet [the] burden [to show work which exists in the national economy]; both national and regional numbers must be cited." Benthin, 2021 WL 2982719, at *8; see also Springer v. Saul, No. 4:19-cv-04030-VLD, 2019 WL 4855186 at *35 (D.S.D. Oct. 1, 2019).

Conversely, courts in the Eastern District of Missouri and the District of Nebraska and "have taken a more pragmatic approach and held that evidence of jobs existing nationally does constitute evidence of work existing in several regions of the country, at least where there is nothing in the number of jobs or the nature of the jobs identified to indicate that those jobs would exist only in

13

limited numbers in isolated regions of the country." Alice T. v. Kijakazi, No. 8:21CV14, 2021 WL 5302141, at *17 (D. Neb. Nov. 15, 2021) (citing Hayden v. Saul, No. 4:19-CV-187-SPM, 2020 WL 888002, at *10-12 (E.D. Mo. Feb. 24, 2020)). In so doing they have emphasized that the Eighth Circuit "ultimately leave[s] to the trial judge's common sense the application of the significant numbers requirement to a particular claimant's factual situation." Id. at *15 (quoting Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997)).

This court has adopted the latter approach. "The purpose of § 423's national economy requirement is to prevent the Social Security Administration from denying benefits on the basis of isolated jobs existing only in very limited numbers in relatively few locations outside the claimant's region." Evert v. Kijakazi, 2022 WL 1749611 at *7 (D.N.D. Feb. 17, 2022) (internal quotation marks omitted). "Allowing nationwide jobs numbers to satisfy the Commissioner's step five burden in certain circumstances vindicates this purpose without requiring the VE and ALJ to recite 'magic words' on pain of remand." Id. (citing Phillips v. Astrue, No. 5:10-cv-2651, 2011 WL 5526079, at *11 (N.D. Ohio Nov. 14, 2011). "Thus, evidence of jobs existing in the national economy constitutes evidence of work existing in several regions of the country, so long as there is nothing in the number or nature of the jobs identified that indicate they exist only in isolated regions of the country." Id. "In adopting that interpretation, however, this court joins other courts in reiterating 'it would certainly be a better practice for the Commissioner to obtain specific evidence regarding the regional availability of jobs.'" Id. (quoting Hussey v. Berryhill, No. 4:17-cv-2507-SPM, 2019 WL 1275047, at *9 (E.D. Mo. Mar. 20, 2019).

Here, the VE identified a total of approximately 8,700 representative jobs available in the national economy that Ell could perform. Doc. No. 8-2 at pp. 22-23. Other courts have concluded

that numbers in this range suffice. See e.g, Taskila v. Comm'r of Soc. Sec., 819 F.3d 902, 905 (6th Cir. 2016) ("Six thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant.'"); Nejat v. Comm'r of Soc. Sec., No. 09-5193, 2009 WL 4981686, at *5 (6th Cir. 2009) (2,000 jobs in the national economy is a significant number); Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009) (collecting cases to conclude "it appears to be well-established that 1,000 jobs is a significant number"); Barker v. Sec'y of Health & Human Servs., 882 F.2d 1474, 1478–79 (9th Cir.1989) (1,266 positions is within the parameters of significant numbers); Craigie v. Bowen, 835 F.2d 56, 58 (3d Cir. 1987) (finding that 200 positions was a significant number); Allen v. Bowen, 816 F.2d 600, 602 (11th Cir. 1987) (stating that 174 jobs in the local area constituted a significant number); Dumas v. Schweiker, 712 F.2d 1545, 1549, 1553–1554 (2d Cir. 1983) (150 positions regionally constituted significant numbers). As Ell has acknowledged, the Eighth Circuit has not established a specific threshold or number of jobs that must exist in order to constitute a significant number.

While a close call, the court finds that the number of jobs identified by the VE is sufficient to meet the Commissioner's burden. In reaching this conclusion, the court notes there is nothing in the record to indicate that the jobs identified by the VE exist only in limited numbers in isolated regions or that the ALJ or VE were unaware of what is to be considered a "significant number" of jobs under 20 C.F.R. § 404.1566.

### B. Functional Capacity Evaluation

The record contains a copy of a Functional Capacity Evaluation ("FCE") report dated October 2, 2018. It appears that Ell was referred for an FCE by North Dakota Workforce Safety Insurance. Doc. No. 8-9 at pp. 45-48. The FCE was conducted on October 1 and 2, 2018, by a

physical therapist Jeanne DeKrey ("DeKrey"), DPT. Id. at p. 45. At the conclusion of the report, which has a box for the evaluator's signature that is blank, DeKrey recommended:

> **Department of Labor/Dictionary, of Occupational Titles** work level is: LIGHT
> Linda Ell is able to work up to 3 hours per day, 5 days per week (part time).
>
> This limited hours recommendation is based on consistent loss of ability with repetition/duration for Grip & Pinch strength, material handling (mostly due to grip strength loss), and hand coordination. Secondary to this, I recommend part time hours with use of Right hands/arms in up to 5 minute increments/10 minutes for Left with rest break or othe[r] activity of 10 minutes allowing for rest of arms/hands.
>
> This was also a concern during her FCA in 2016 and will include this clarification: The 5-10 minutes of hand/arm use is intended for normal work activities and could include, but is not limited to, gross motor activity such as handling objects and fine motor activity as data entry. The 'rest break/other activity' is intended to be a total work break but rather an interval of less intensive upper extremity activity and could include, but not limited to, more cognitive/visual/verbal activity such as phone work with a headset, potential adaptive software for computer (such as voice activation) with low repetition and force for the arms and hands.

Id. at p. 47 (emphasis in original).

When addressing Ell's RFC at step four of her analysis, the ALJ discounted the FCE and with it the physical therapist's recommendations, opining:

> As for other opinion evidence, the functional capacity assessment completed over two days in October 2018 by physical therapist Jeanne DeKrey, DPT, found the claimant capable of work at the "light" level with the ability to work up to three hours per day, five days per week (so on a part-time basis). Dr. DeKrey indicated that the limited hours recommendation is based on consistent loss of ability with repetition/duration for grip & pinch strength, material handling (mostly due to grip strength loss), and hand coordination. Secondary to this, part time hours are recommended with use of right hand/arm in 5 minute increments and 10 minutes for the left with rest break or other activity of 10 minutes allowing for rest of arms/hands (so not a an actual break but performance of other activities not involving constant upper extremity use/less intensive upper extremity activity) (Ex. B1F at 44 - 46.
>
> The undersigned is not fully persuaded by the functional capacity assessment, in particular the claimant's restriction to three hours of work per day. While the specific limitations as they pertain to light lifting/carrying restrictions do seem appropriate based on the evidence and are consistent with the functional capacity assessment

findings, the residual functional capacity given herein accounts for the "rest breaks or other activity" needed for the claimant's upper extremities with restriction to only occasional upper extremity use. Rather, there is no objective medical evidence in the current record associated with the relevant period from June 6, 2018 to December 31, 2019, that supports such extreme restrictions (able to work just three hours per day).

The September 20, 2020 opinion evidence (over nine months after the date last insured), which is associated specifically with the claimant's 2009 work injury and which contains an unreadable signature without identifying the medical professional completing the form, references the October 2018 functional capacity assessment (discussed above) yet still limits the claimant to even greater restriction (only two hours of work per day). Notwithstanding the limitations that would preclude competitive full-time work (two hours per day, unscheduled breaks, excessive absences), it was opined the claimant is able to lift and/or carry up to 20 pounds occasionally and 10 pounds frequently with up to occasional postural activities, and seemingly up to occasional manipulative abilities (See Ex. B7F).

Like the functional capacity evaluation and despite not knowing the medical professional who completed the form, the undersigned is unpersuaded by the opinion that the claimant cannot work more than part-time work (in this case, two hours). As stated above, the functional capacity assessment indicated that as long as the claimant is not subjected to constant upper extremity use, so there are alternative work duties consistent with the residual functional capacity limitations given herein (e.g., only occasionally push/pull up to five pounds with each upper extremity, reach overhead, and handle, finger and feel with the upper extremities), coupled with the other residual functional capacity limitations, the claimant is not precluded from full-time competitive work consistent with the vocational expert testimony (discussed below).

Doc. No. 8-2 at pp. 20-21.

Ell takes issue with the weight or lack therefore afforded by the ALJ to the FCE. Specifically, she asserts:

> The ALJ committed reversible error in determining there "is no objective medical evidence in the current record associated with the relevant period from June 6, 2018 to December 31, 2019, that supports such extreme restrictions (able to work just three hours per day)." Doc. 8-2 at 20. The Eighth Circuit has repeatedly recognized that an FCE is "objective clinical evidence regarding how a benefits claimant's medical conditions affect his or her ability to work." Green v. Union Sec. Ins. Co., 646 F.3d 1042, 1051 (8th Cir. 2011) (emphasis added). "An FCE need not establish conclusively that a benefits claimant will be capable of working day after day, week after week, year after year. Rather its value is in objectively evaluating a

17

> person's work capabilities." Id.
>
> Here, the FCE was performed over two days, October 1 and 2, 2018. Doc. 8-9 at 45-47. The FCE is also clear that Plaintiff gave "Full Effort on all tests[.]" Id. at 46. Like the FCE, the ALJ also discredited, without articulating any references to the record, a September 20, 2020 opinion statement that references the FCE because it "contains an unreadable signature without identifying the medical professional completing the form[.]" Doc. 8-2 at 20. However, the ALJ asked Plaintiff's prior counsel at the administrative hearing if it was "Dr. Shearer" who completed the "form submitted [ ] from September 20th of 2020" and he replied, "That is Dr. Shearer, Your Honor."
>
> Thus, on this record it is clear that the FCE is objective evidence and was not properly considered. Rather, it was dismissed out of hand. Further, the ALJ had evidence to support Dr. Shearer was the author of the September 20, 2020 opinion. Like the FCE, Dr. Shearer's opinion was improperly rejected without any articulation of its supportability or consistency with the rest of the evidence of record.

Doc. No. 11 at pp. 6.

In response, the Commissioner maintains that the ALJ did not simply dismiss the FCE because it was unsigned but rather deemed it a form completed by a medical professional and evaluated it accordingly.

It does not appear from the record that the ALJ ignored the FCE because it was unsigned or rejected the form/opinion from September 20, 2020, because its author was not immediately apparent. Rather, the record reflects that, when determinating Ell's RFC, the ALJ did consider the FCE and the form but ultimately discounted them due to what she deemed to be a dearth of supporting objective medical evidence. Doc. No. 8-2 at pp. 20-21.

### IV.   CONCLUSION

In this case, the ALJ correctly applied governing law, regulations, and policy guidance, and there is substantial evidence supporting the Commissioner's decision. As long as there is substantial evidence supporting the decision, this court may not reverse it simply because there is substantial evidence supporting a contrary outcome or because the court would have decided the case

differently. Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001); see also Schmitt v. Kijakazi, 27 F.4th 1353, 1361 (8th Cir. 2022).

Accordingly, the Commissioner's Motion for Summary Judgment (Doc. No. 12) is **GRANTED**, Ell's Motion for Summary Judgment (Doc. No. 10) is **DENIED,** and the Commissioner's decision is **AFFIRMED.**

**IT IS SO ORDERED.**

Dated this 3rd day of April, 2024.

*/s/ Clare R. Hochhalter*
Clare R. Hochhalter, Magistrate Judge
United States District Court